SPRAGUE v. WEBB et al.  (No. 7453.)

(Supreme Court, Appellate Division, First Department.  June 18, 1915.)

1. CONTRACTS ⬲322—ACTION FOR BREACH—EVIDENCE—PERFORMANCE.

In an action for defendant's breach of contract to use his best efforts to carry out and perform a contract for the purchase of railroad stock for the benefit of plaintiff, defendant, and another, and to secure which stock contract they had advanced money, which the purchaser under its terms retained as a forfeit, evidence *held* to show that defendant, by endeavoring to find a purchaser or guarantor of the railroad bonds to be issued in payment for the stock, had used his best efforts to perform the contract.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1306, 1307, 1339, 1347, 1348, 1465, 1492, 1534–1542, 1754, 1768, 1772, 1801, 1802, 1804–1808, 1815, 1816; Dec. Dig. ⬲322.]

2. DAMAGES ⬲120—MEASURE—BREACH OF CONTRACT.

In such case, the measure of damages for breach of a contract would be the value of the contract to plaintiff if it had been performed, and not the amount which plaintiff had advanced on the original contract for the purchase of the railroad stock.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 291–305; Dec. Dig. ⬲120.]

3. CONTRACTS ⬲109—ILLEGALITY—PURCHASER OF RAILROAD STOCK.

A contract whereby plaintiff, defendant, and another, who were interested in a railroad, agreed to buy substantially the entire issue of the stock of another railroad and to pay therefor, by an issue of its corporate bonds, sufficient to produce the purchase price, and to turn over a part of the stock to their road for voting purposes, retaining the beneficial interest and the right to dividends, and to divide the remainder of the stock between themselves, contemplated a fraud, either upon the railroad whose stock was purchased, or upon the purchasers of the bonds, depending upon whether the railroad should thereafter undertake or be able successfully to attack the validity of the bonds, and was illegal and immoral; and an agreement between the purchasers, whereby one undertook to find a purchaser of or a guarantor of the bonds, was tainted with the same illegality, and was unenforceable.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 469, 483; Dec. Dig. ⬲109.]

4. CONTRACTS ⬲138—ILLEGALITY—PLEADING.

The fact that the illegality of a contract was neither pleaded nor urged at the trial is of no moment, for where it appears that the contract is opposed to good morals or sound public policy, or offends the provision of a statute, the court, regardless of the pleadings, and of its own motion, will deny relief thereunder.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. ⬲138.]

5. CONTRACTS ⬲138—ILLEGALITY—RECOVERY.

Where a scheme for the purchase of railroad stock to be paid for by an issue of its own bonds was illegal and immoral, there could be no recovery for services rendered by a purchaser in attempting to carry it out.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 681–700; Dec. Dig. ⬲138.]

Appeal from Trial Term, New York County.

Action by Henry L. Sprague against William S. Webb and the Dominion Securities Company. From a judgment in favor of plain-

tiff, after trial before a referee, defendants separately appeal. Reversed, and complaint dismissed.

Argued before INGRAHAM, P. J., and McLAUGHLIN, LAUGHLIN, CLARKE, and SCOTT, JJ.

Howard Taylor, of New York City (Henry B. Anderson and Roy C. Gasser, of New York City, on the brief), for appellant Webb.

Philip W. Russell, of New York City, for appellant Dominion Securities Co.

Morgan J. O'Brien, of New York City (Daniel P. Hays and Edwin D. Hays, both of New York City, on the brief), for respondent.

SCOTT, J. Plaintiff sues defendant Webb for damages for having failed to use his best efforts to carry to a successful termination a joint adventure by which plaintiff Webb and one Arthur L. Meyer had planned and hoped to acquire, without cost to themselves, substantially all of the capital stock of the Canada Atlantic Railway. This stock was owned or controlled by one John R. Booth, and on January 22, 1902, an agreement was made between Booth and Meyer, who acted for himself, and for plaintiff and the defendant Webb, whereby Booth agreed to sell, and Meyer for himself and his associates agreed to buy, substantially the entire issue of the capital stock of the Canada Atlantic Railway, consisting of common stock of the par value approximately of $5,200,000, and preferred stock of the approximate par value of $2,000,000, for the sum of $10,000,000 in cash. It was no part of the scheme of the joint adventurers to themselves furnish any part of this purchase price. Their plan was to issue mortgage bonds of the Canada Atlantic Railway for an amount sufficient to produce the stipulated purchase price and to discharge a small mortgage then covering a portion of the property of the railway, to sell the bonds and to use so much of the proceeds of the sale as might be necessary to complete the purchase of the stock from Booth. It was then contemplated to turn over to the Rutland Railroad, in which all of the joint adventurers were interested, 60 per cent. of the stock thus to be acquired from Booth, to be used for voting purposes, the beneficial interest in the stock so turned over being retained by the joint adventurers, who were to be entitled to all dividends that might be earned. The remaining 40 per cent. of the stock purchased was to be divided between the joint adventurers. The plan was thus succinctly stated by plaintiff:

"Shortly put, therefore, the scheme was that when we bought the road from Booth, we, the purchasers, were to raise the money by issuing bonds of the railroad company and selling them and paying the proceeds to Booth in exchange for his stock."

By its terms the contract with Booth was to be completed on or before June 1, 1902, and the success of the scheme depended upon finding some one who would agree, before that date, to purchase the bonds when issued. This plaintiff and Meyer attempted to do, but without success. Among other things, the contract with Booth provided for the advance to him of the sum of $1,000,000 of which he was to be obligated to return only $750,000 if the joint adventurers failed to

complete their purchase of his stock. This provision of the contract was modified on or about March 7, 1902, so as to provide that the sum of $250,000 should be paid to Booth as security for the due performance of the contract according to its terms, with the agreement that if default should be made in the completion of the contract by or on the 1st day of June, 1902, the said sum should be forfeited to and thereafter remain the property of said Booth, as liquidated damages for such default. Said sum was accordingly paid to Booth, defendant Webb contributing $125,000, and Meyer a like amount, which he borrowed from a trust company upon collateral security, a part of which was furnished by plaintiff. Plaintiff and Meyer having been unsuccessful in finding a purchaser for the proposed issue of bonds, Webb, on April 17, 1902, took up the task of finding one, and then, as plaintiff claims, made the specific agreement for the breach of which this action has been brought and damages have been awarded.

In his complaint plaintiff gives two versions of this specific agreement. In his first cause of action he alleges that Webb's agreement was that he "would use his best efforts to secure the due performance of said contract, and would devote himself faithfully to the accomplishment thereof." In his second cause of action Webb's agreement is alleged to have been:

"That the said contract should be fully and completely carried out and performed by the defendant Webb for the benefit of the plaintiff and the said Meyer and the defendant Webb in equal proportions on or before the 1st day of June, 1902, the date fixed for the performance thereof."

The referee, quite rightly as we think, has rejected the second version of the agreement, and has rested his decision upon a finding that Webb's undertaking was to use his best efforts to carry out and perform the contract. Plaintiff and Meyer thereupon turned the whole matter over to Webb, Meyer finally assigning to him the contract with Booth. There appears to be no question that for about two weeks Webb was active, although unsuccessful, in his efforts to arrange for a sale of the bonds. On May 2, 1902, Meyer, who was largely involved in many speculative enterprises, became unable to meet his liabilities, and his failure heavily involved Webb, who had been interested with him in many matters besides the proposed purchase of the Canada Atlantic Railway. So seriously was Webb involved that his relatives found it necessary to come to his assistance with large sums of money, running up into the millions, and to undertake the liquidation and adjustment of his affairs. From that time Webb seems to have taken no further steps looking to the completion of the purchase of the Canada Atlantic stock, or with regard to any other business. The result was that the contract for the purchase of the stock was not consummated, the $250,000 deposited with Booth was retained by him, and the joint adventure for the acquisition of the Canada Atlantic Railway came to nothing. Among the advances made to Webb by the members of his family was the sum of $500,000, which Webb in turn paid over to Meyer to meet some of the most pressing of his liabilities. With a portion of this money Meyer paid the balance then remaining unpaid of the $125,000 which he had borrowed to pay to Booth, thus

releasing the securities which had been deposited by plaintiff, which were thereupon returned to him. Briefly stated, these are the salient facts upon which plaintiff bases his claim to a recovery from Webb.

[1] The learned referee was of the opinion that Webb had failed to fulfill his agreement to use his best efforts to carry out and perform the contract with Booth, and that the plaintiff and Meyer, whom plaintiff represents in this action, had been damaged thereby to the extent of the sum contributed by them to the payment of $250,000 to Booth, to wit, $125,000, with interest thereon, and he directed judgment to be entered therefor. We find difficulty in following the referee in these conclusions. Keeping clearly in mind that Webb's utmost undertaking to plaintiff and Meyer was to use his best efforts to carry out the contract, we are of the opinion that the plaintiff wholly failed in proving that Webb did not use the best efforts that, under the circumstances, he was capable of using, or that there were any efforts which he might have made, but did not, which would, with reasonable probability, have resulted in a consummation of the projected purchase of the stock. As has already been said, the success of the scheme was entirely dependent upon finding some one who would purchase the bonds proposed to be issued, and it became very evident from the results of the efforts of Sprague and Meyer from January to April that such a purchaser could only be found if it could be arranged that the Rutland Railroad Company would guarantee the payment of the principal and interest of the bonds. There is not the slightest indication in the evidence that such a guaranty could, at any time, have been arranged for; certainly not after May 2, 1902, when Webb's efforts to find a purchaser apparently ceased, because then or shortly afterwards Webb lost his influential position with respect to the Rutland Company. It is apparent that from that date Webb was in such a financial position, and in such a state of health, that it is quite improbable that any efforts he might have made to carry out the contract with Booth would have been successful, and the plaintiff does not suggest that any such efforts which Webb could have made during the month of May might reasonably be expected to result favorably.

[2] So as to the damages. If plaintiff and Meyer had a valid contract with Webb which he broke, and they are entitled to damages at all, those damages should be measured by the value of the contract to them if it had been fulfilled. No evidence of such value was proven. The sum for which judgment has been awarded was not paid out by plaintiff and Meyer on the faith of Webb's undertaking to use his best efforts to carry out the contract with Booth. It had been paid out long before that promise was made, and while plaintiff and Meyer were attempting to raise the money to complete the purchase of the stock. For these reasons we are of opinion that the judgment appealed from cannot be sustained.

[3] But the fundamental objection to the judgment appealed from lies much deeper, and goes to the right of the plaintiff to any recovery. The scheme devised by plaintiff, Meyer, and Webb, and for failing to carry out which it is sought to mulct Webb in damages, was clearly an illegal and immoral one. The joint adventurers proposed to pur-

chase, as their own property and for their own benefit, the stock of the Canada Atlantic Railway Company, and proposed to pay for it, not with their own money, but with money to be borrowed by the railway company without any consideration moving to it, or advantage accruing to it. In other words, they proposed that the railway company should issue its bonds, and that they should receive and use the proceeds thereof for their own private and personal ends. This contemplated working a fraud, either upon the railway company, or upon the purchasers of the bonds, depending upon whether or not the company should thereafter undertake or be able successfully to attack the validity of the bonds. It is fundamental law that the courts will not enforce, as between the parties to it, an illegal contract or one which is contrary to public policy or good morals, nor aid either party in enforcing it, nor give damages for a breach of it. The law simply leaves the parties where it finds them. The rule and the reason for it were well expressed many years ago by Lord Mansfield in Holman v. Johnson (1 Cowp. 341). He said:

"The objection that a contract is immoral or illegal as between plaintiff and defendant sounds at all times very ill in the mouth of the defendant. It is not for his sake, however, that the objection is ever allowed, but it is founded on general principles of policy which the defendant has the advantage of, contrary to the real justice as between him and the plaintiff, by accident, if I may so say. The principle of public policy is this: 'Ex dolo malo non oritur actio.' No court will lend its aid to a man who founds his cause of action upon an immoral or an illegal act. If from the plaintiff's own showing or otherwise the cause of action appears to arise ex turpi causa, or the transgression of a positive law, then the court says he has no right to be assisted."

If the scheme to purchase the stock for the benefit of the joint adventurers with the money of the railway company was illegal and immoral, as we think it clearly was, then any agreement to undertake to carry out the scheme was tainted with like illegality and is equally unenforceable. Barton v. Port Jackson, etc., 17 Barb. 397; Goodrich v. Houghton, 55 Hun, 526, 9 N. Y. Supp. 214; Id., 134 N. Y. 115, 31 N. E. 516. The plaintiff on this appeal makes but slight attempt to defend the legality of the scheme in which he and Meyer and Webb were engaged to acquire the stock of the Canada Atlantic Railway, except to suggest that there may have been valid considerations, not disclosed by the evidence, sufficient to support the proposed issue of bonds. This suggestion, of course, is not made very seriously, for the evidence clearly indicates that there was no such consideration, but a sufficient answer is that, if the apparently illegal agreement between the joint adventurers, as testified to by plaintiff himself, in reality concealed an honest purpose, it was for the plaintiff to show that fact, which he made no attempt to do. Nor is it an answer to say that the agreement between Booth and Meyer acting for the joint adventurers appears upon its face to be a fair and honest one. It is not upon that agreement that plaintiff sues. The vice lies in the agreement between the joint adventurers inter sese, and plaintiff's grievance is that he was prevented from reaping the fruits of that agreement by Webb's failure to consummate the contract with Booth.

[4] It does not appear that this objection to plaintiff's recovery was brought to the attention of the referee, and he does not consider it in his opinion. "The fact that the illegality of the contract was neither pleaded nor urged at the trial is of no moment; for in every case, regardless of the pleadings, where it appears that the contract before the court is opposed to good morals or sound public policy, or offends the provisions of a statute enacted for the public good, the court will, of its own motion, deny relief thereunder." Barry v. Mulhall, 162 App. Div. 749, 147 N. Y. Supp. 996; Dunham v. Hastings Pavement Co., 56 App. Div. 244, 67 N. Y. Supp. 632.

[5] The plaintiff has also recovered, upon a separate cause of action a substantial sum for legal services rendered in furtherance of the scheme joined in by himself and Meyer and Webb. If the scheme was illegal and immoral, there can be no recovery for services rendered in attempting to carry it out. It follows that no part of the judgment appealed from can be sustained, and that upon the undisputed evidence, furnished in the main by plaintiff himself, there can be no recovery at all for any cause of action embraced in the complaint. This conclusion renders it unnecessary to consider the claim of the defendant Dominion Securities Company to share in plaintiff's recovery.

The judgment appealed from must therefore be reversed and the complaint dismissed, with costs and disbursements to the defendant appellant Webb as against the plaintiff in this court and in the court below. The findings to be reversed and the new findings to be made will be settled upon the entry of the order hereunder. All concur.